1
2
3
4
5
6        IN THE UNITED STATES DISTRICT COURT
7       FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9    LOVELL S. KELLER, G-56168,          )
                                         )
10              Petitioner,              )     No. C 11-1190 CRB (PR)
                                         )
11        vs.                            )     ORDER DENYING PETITION
                                         )     FOR A WRIT OF HABEAS
12    M. McDONALD, Warden,               )     CORPUS
                                         )
13              Respondent.              )
     _____)
14

15        Petitioner Lovell S. Keller, a state prisoner incarcerated at California State

16   Prison, Solano, seeks a writ of habeas corpus under 28 U.S.C. § 2254 claiming

17   that the police violated their duty to preserve material evidence under California

18   v. Trombetta, 467 U.S. 497 (1984).  For the reasons set forth below, the petition

19   is DENIED.

20                        **STATEMENT OF THE CASE**

21        Petitioner was convicted by a jury in Mendocino County Superior Court of

22   first degree murder, Cal. Penal Code § 187, with a knife-use allegation, id. §

23   12022(b)(1), and first degree burglary, id. § 459.  On April 28, 2009, the court

24   sentenced him to 25 years to life plus one year.  Petitioner appealed.

25        On August 11, 2010, the California Court of Appeal affirmed the

26   judgment of the trial court and, on October 20, 2010, the California Supreme

27   Court denied review.

28        On April 6, 2011, petitioner filed the instant federal petition.

# FACTUAL AND PROCEDURAL BACKGROUND

The California Court of Appeal summarized the factual and procedural background of the case as follows:

## I. Facts

Defendant Lovell Sabastian Keller lived in Willits with his long-term girlfriend, Darcy McNulty, and their young son. He worked at a café with Brandi Carlile, who lived about half a mile away from defendant with her long-term boyfriend, Riley Gibbons, and their four-year-old daughter. Defendant and Carlile became close friends and started having a sexual relationship. Gibbons had seen text messages from defendant on Carlile's cell phone, though Carlile denied that she and defendant were having an affair.

On June 10, 2008, defendant and McNulty had a barbeque with family members. On the same day, Carlile and Gibbons had another couple over to their house to watch basketball, eat pizza and play cards. Both groups drank considerable amounts of alcohol at their respective gatherings.

Defendant left his house during the evening and walked to the Village Market to buy another bottle of the liqueur he had been drinking since the afternoon. Coincidentally, Gibbons arrived at the market at about the same time to buy some cigarettes. The store clerk, Sonia Mendoza, believed defendant had been drinking but did not think he was too intoxicated to purchase alcohol.

Gibbons approached the counter as defendant was completing his purchase. Defendant gave him what appeared to be a friendly nudge and said, "I love your wife." Gibbons responded by punching defendant near his right ear, causing him to fall against a glass display case. After defendant fell to the floor, Gibbons straddled him and punched him several times in the head. Defendant did not punch Gibbons or otherwise defend himself. Mendoza called the police and Gibbons left the store.

Officer McNelley and Sergeant Anderson of the Willits Police Department responded to the call at 11:05 p.m., about five minutes after dispatch received Mendoza's call. Officer McNelley interviewed defendant, who had some blood on his ear, and took a photograph of the injury. Defendant was intoxicated but did not appear to be unable to take care of himself. He told McNelley he had been attacked from behind and punched three or four times, but had not lost consciousness. Defendant identified Gibbons as his assailant and wanted him arrested, but McNelley would not arrest Gibbons for a misdemeanor committed outside his presence. Instead, the proper procedure was to submit the case to the district attorney. Sergeant Anderson viewed a digitally recorded store surveillance video that showed Gibbons's assault on defendant, but

Anderson was unable to download the video himself and no one working at the market was able to provide a copy.

McNulty came to the market after learning of the attack, and she and defendant walked home together. She thought defendant seemed stunned and "kind of delusional." Meanwhile, Gibbons had returned to his house and told Carlile he had "just beat up [her] little wannabe boyfriend Lovell." Gibbons also accused Carlile of sleeping with defendant. Carlile, who was drunk and did not want to discuss the subject, denied the accusation and went to sleep with her daughter in the bedroom.

At about 3:00 in the morning (by now it was June 11), Carlile awoke and realized that Gibbons had not come to bed. She got up and discovered him lying dead on the kitchen floor in a pool of blood, having been stabbed several times. Hysterical, she telephoned 911. Officer McNelley and Sergeant Anderson were dispatched to the house at 3:12 a.m. Anderson had driven by between 1:00 and 2:00 a.m. as part of his regular patrol and had noticed the front door was open and the lights were on, but he had not investigated because he knew the people who lived there sometimes entertained late into the night.

After discovering Gibbons' body, Carlile checked her cell phone and discovered that at 12:05 a.m. on June 11, defendant had sent her a text message that said, "Y boy is dead." Defendant, having already been questioned, was taken into custody, advised of his Miranda rights and interrogated. He admitted a sexual relationship with Carlile and explained that he had sent her the text "Y boy is dead" because he intended to beat up Gibbons next time he saw him.

About two-tenths of a mile from Gibbons' house, investigators found a knife in a storm drain under a grate. McNulty identified a photograph of the knife as one of her kitchen knives. She told police that she and defendant had walked home after he was assaulted at the market, but acknowledged that he later left the house again and returned while she was in bed.

Defendant placed a telephone call to McNulty from jail. During the call (which was recorded) he said, "[I]t's my fault ... I shouldn't of went over there ... I went over there to hurt him...." Defendant added, "I didn't intend on going over there to kill that guy ... [¶] That wasn't my plan ... but that's what happened." Defendant told McNulty that Gibbons had jumped out of his chair and come at him, at which point defendant stuck him and stabbed him in the back. After asking McNulty to get a copy of the surveillance tape from the market showing Gibbon's earlier assault on defendant, defendant explained, "[I]t's showing how that mother fucker attacked me, he didn't have no mercy when he hit me in the back of my head ... so why should I have mercy when I went to his house and took his life?"

3

A medical examiner performed an autopsy on Gibbons' body and determined that he had bled to death from multiple stab wounds to the chest. He had suffered a total of ten stab wounds, all above the waist: five in the back, three in the front, and one on each arm. One wound had collapsed a lung; another had cut a chamber of Gibbons' heart. The knife found in the storm drain was consistent with the weapon used to cause these wounds, and DNA testing revealed a match between Gibbons and the blood found on that knife. High levels of alcohol and methamphetamine were in Gibbons' system at the time of his death.

A criminalist who arrived to photograph the crime scene on the morning the body was discovered noted that while there was a lot of blood, it was not dispersed and there was no sign of a struggle. It did not appear that Gibbons had made any significant attempt to defend himself, given the lack of defensive wounds and the way in which his body had collapsed on the floor.

Defendant's blood was drawn at 5:30 p.m. on the afternoon following the killing. Although there was no alcohol in defendant's system at that time, a licensed clinical toxicologist calculated that in light of his height and weight, and assuming the liquor consumption described by McNulty, his blood alcohol level near the time of the killing could have been about 0.30 percent, or more than three times the legal limit for driving.

Police officers requested several times that the Village Market provide a copy of the surveillance video showing Gibbons' assault on defendant, but, as we discuss, no copy was provided and the tape was overwritten after seven days.

## II. Procedural History

Defendant was charged with one count of first degree murder with a knife-use allegation and one count of first degree burglary. (Pen. Code, § 187, 459, 12022, subd. (b)). The case proceeded to a trial in which the jury was instructed on second degree murder and voluntary manslaughter as lesser included offenses. The jury found defendant guilty of first degree murder and burglary as charged and found true the allegation that a knife had been used in the commission of the murder. The court sentenced defendant to prison for a term of 25 years to life plus one year.

## III. Trombetta Motion

Before the trial began, defendant filed a Trombetta motion seeking dismissal of the charges based on the failure of police to preserve the surveillance video from the Village Market. (Trombetta, *supra*, 467 U.S. 479.) Defendant argued that the video was critical to his defense because it tended to show that the charged homicide was the product of provocation rather than premeditation, and that he

4

was guilty of only second degree murder or voluntary manslaughter.

The surveillance video in question was a digital recording produced on a computer rather than on a reel-to-reel or videotape that could be readily removed from a recording machine.  Sergeant Anderson viewed the video in the store on the night of June 10, 2008, when he responded to the report of Gibbons' assault on defendant, but he was not able to download the images that night.  Anderson told one of the store owners that he wanted a copy and asked that the video be preserved.  Officer McNelley also asked the store clerk, Sonia Mendoza, to provide him with a copy, but Mendoza was unable to do so.

Sergeant Anderson returned to the Village Market on June 11 and again requested a copy of the recording, to no avail.  Officer McNelley went by the market on following day and spoke to the owner, reiterating the need to preserve the video.  On June 23, 2008, another officer went to the Village Market and learned that the recordings on the surveillance system were preserved for only seven days and that the footage of the assault had been overwritten.  The store owner had originally thought the data would be stored for up to 90 days.  The hard drive of the computer was collected by police on August 20, but the recording could not be recovered.

The trial court denied the Trombetta motion, reasoning as follows: (1) police do not have a duty to collect evidence, and this case involves a failure to collect rather than a failure to preserve evidence already collected; (2) the evidence had both inculpatory and exculpatory value in the murder prosecution; (3) the defendant could obtain comparable evidence because other witnesses had seen the assault and viewed the tape and could testify about the same; and (4) there was no bad faith on the part of the police, who made efforts to obtain the video and wanted it for their own purposes because the assault supplied a motive for murder.  Defense counsel renewed the motion midtrial, and it was again denied.

People v. Keller, No. A124739, 2010 WL 3159027, at **1-4 (Cal. Ct. App. Aug. 11, 2010).  The California Court of Appeal found that the trial court did not err in denying petitioner's Trombetta motion and affirmed the judgment of the trial court.  See id. at *7.

## DISCUSSION

**A.    Standard of Review**

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the

ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'reasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme

6

Court as of the time of the state court decision.  Id. at 412; Clark v. Murphy, 331
F.3d 1062, 1069 (9th Cir. 2003).  While circuit law may be "persuasive
authority" for purposes of determining whether a state court decision is an
unreasonable application of Supreme Court precedent, only the Supreme Court's
holdings are binding on the state courts, and only those holdings need be
"reasonably" applied.  Id.

**B.**     **Claim and Analysis**

Petitioner claims the police violated their constitutional duty to preserve
material evidence under Trombetta when they failed to preserve the surveillance
video from the Village Market, which had recorded his confrontation with
Gibbons.  Petition ("Pet.") at 6.  Petitioner contends that the video would have
supported his claim that the killing was the product of provocation rather than
premeditation or, alternatively, that he was so intoxicated at the time of the
killing that he could not form the requisite intent, such that he was guilty of only
second degree murder or voluntary manslaughter.  Traverse ("Trav.") at 5-6.

The constitutional duty to preserve evidence is limited to material
evidence, i.e., evidence whose exculpatory value was apparent before its
destruction and that is of such nature that the defendant cannot obtain comparable
evidence from other sources.  California v. Trombetta, 467 U.S. 479, 489 (1984).
In order to establish a due process violation for failure to preserve only
potentially useful evidence, a petitioner must show bad faith on the part of the
police.  Illinois v. Fisher, 540 U.S. 544, 547-48 (2004); Arizona v. Youngblood,
488 U.S. 51, 58 (1988).

The California Court of Appeal rejected petitioner's Trombetta claim on
the merits.  People v. Keller, 2010 WL 3159027, at *4.  The court of appeal
reasoned that: (1) the case involved a failure to collect rather than to preserve

evidence, and there was no due process violation because there was no evidence that the police acted in bad faith in failing to collect the tape; (2) even if the destruction of the video could be attributed to the police, there was no Trombetta violation because (a) the video was not clearly exculpatory and (b) comparable evidence in the form of witness testimony was reasonably available; and (3) the video at most was only "potentially useful" evidence, and there was no due process violation because there was no evidence of bad faith on the part of the police.  Id. at *4-6.

Petitioner is not entitled to federal habeas relief on his Trombetta claim because the California Court of Appeal's rejection of the claim was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent, nor was the decision based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

### 1.   Petitioner's case involved a failure to collect evidence

The California Court of Appeal did not unreasonably determine that petitioner's due process rights were not violated because the case involved a failure to collect rather than to preserve evidence and there was no indication that the police failed to collect the video in bad faith.  See id.

The duty to preserve material evidence under Trombetta is limited to evidence that has actually been gathered.  467 U.S. at 488-90.  But although the police ordinarily have no duty to collect exculpatory evidence, a bad faith failure to collect exculpatory evidence may constitute a due process violation.  See Miller v. Vasquez, 868 F.2d 1116, 1119-21 (9th Cir. 1989) (due process requires police to gather and collect evidence where police themselves by their conduct indicate that the evidence could form a basis for exoneration).

1    Here, despite repeated efforts to collect the tape, the police never obtained

2    the surveillance video or a copy of it.  Although petitioner suggests that the

3    police failed to preserve collected evidence because "the computer was

4    voluntarily given to the police," Trav. at 3-4, the record makes clear that the

5    computer that once contained the video was handed over to the police after the

6    relevant video footage had been overwritten.  The surveillance video was erased

7    while in the store owner's possession.  Thus the police never actually obtained

8    the evidence at issue and their Trombetta duty was not triggered.  Nor is there

9    any indication of bad faith on the part of the police.  That the police operated

10   according to the store owner's ultimately mistaken belief that the tape would be

11   preserved for 90 days does not show a bad faith effort to prevent the defense

12   from obtaining exculpatory evidence.  Cf. Miller, 868 F.2d at 1119-20.  After all,

13   the police sought to collect the video because they believed it was inculpatory

14   and would provide evidence of motive for murder.

15   Under the circumstances, it simply cannot be said that the California Court

16   of Appeal's determination that the police did not violate petitioner's due process

17   rights by failing to gather the surveillance video from the market was objectively

18   unreasonable.  See Williams, 529 U.S. at 409.

19        **2.        There was no Trombetta violation**

20   The California Court of Appeal did not unreasonably determine

21   that there was no Trombetta violation because, even if the destruction of the

22   video could be attributed to the police, the video was not clearly exculpatory and

23   comparable evidence in the form of witness testimony was reasonably available.

24   See 28 U.S.C. § 2254(d).

25   As noted earlier, the constitutional duty to preserve material evidence

26   requires that the evidence "must both (1) possess an exculpatory value that was

27

28                                        9

apparent before the evidence was destroyed, and (2) be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Trombetta, 467 U.S. at 489.

It was not objectively unreasonable for the California Court of Appeal to determine that petitioner did not establish the first prong of Trombetta.  Although the court recognized that the tape "did tend to show provocative conduct by the victim," it reasonably found that it was not clearly exculpatory under Trombetta because the tape also was "highly inculpatory in that it . . . supplied a motive for the killing and strongly suggested premeditation." People v. Keller, 2010 WL 3159027, at *6 (citations omitted).  Petitioner's contention that the video would have shown that the charged homicide was a product of provocation rather than premeditation and "would have helped the jury gauge exactly how intoxicated petitioner was rough two to three hours before Gibbons was murdered," Trav. at 5, 8, does not compel a different conclusion.  After all, the video captured only the assault that occurred hours before the murder, not the murder itself, and it is unclear how any depiction of petitioner's intoxication during the assault would be exculpatory of his actions several hours later.

Nor was it objectively unreasonable for the California Court of Appeal to determine that petitioner did not establish the second prong of Trombetta.  The court explained that substantial comparable evidence was available by other means:

> The surveillance video captured an assault by Gibbons upon defendant in which defendant did not respond in kind.  Sonia Mendoza, the clerk at the Village Market, personally witnessed the assault and described it in her testimony.  Sergeant Anderson, though not a witness to the assault, had viewed the video and testified in detail of its contents.  Defendant was able to show through these witnesses that he was the victim of a physical assault by the victim on the night of the homicide, and was able to argue from this evidence that provocation by the victim should reduce his culpability.

People v. Keller, 2010 WL 3159027, at *6.

Petitioner argues that these witnesses' testimony is not comparable to the video because "it is in no way as demonstrative and powerful as the actual image of the decedent" attacking petitioner. Trav. at 7. He contends that the video would have shown "exactly how hard petitioner hit his head when he struck it on the glass that shattered in addition to showing how vicious[ly] and merciless[ly] Gibbon's assaulted petitioner." Id. And he adds that at trial Mendoza could not remember if petitioner immediately fell down after being hit and that Anderson was unable to tell if petitioner had lost consciousness. Id.

The record shows that Mendoza testified that petitioner was punched with a closed fist and hit repeatedly when he was on the ground. 1 Rep. Tr. at 114, 116. Sergeant Anderson testified that he observed Gibbons punch petitioner with a closed fist, causing petitioner to fall into a glass display case. Id. at 209. Anderson further testified that while petitioner was on the ground, Gibbons straddled petitioner and punched him in the head three to four times. Id. at 212-213. Officer McNelly and Mendoza testified to the injuries they observed on petitioner that night, and photographs of petitioner's injuries were offered into evidence. Id. at 123-24.

Under the circumstances, it was not objectively unreasonable for the state court to determine that these witnesses' testimony constituted a comparable substitute for the surveillance video under Trombetta. By cross examining these witnesses, petitioner was able to present evidence that he was victim to an assault on the night of the murder and argue that this evidence of provocation should reduce his culpability. Moreover, the witness testimony included descriptions of the brutality of the assault that were "comparable" to the evidence that would have been provided by the surveillance video.

### 3.   No due process violation for failure to preserve "potentially useful" evidence

The California Court of Appeal did not unreasonably determine that petitioner's due process rights were not violated because the video was at most only "potentially useful" to petitioner's defense and there was no evidence of bad faith on the part of the police.  See 28 U.S.C. § 2254(d); Illinois v. Fisher, 540 U.S. 544, 547-48 (2004) (due process violation for failure to preserve only potentially useful evidence requires bad faith on the part of the police).

As noted earlier, the California Court of Appeal did not unreasonably determine that due to the "highly inculpatory" nature of the video, the recording was at most only "potentially useful" to petitioner's defense.  Nor did the court unreasonably determine that there was no indication that the police had acted in bad faith or made any purposeful effort to destroy of the surveillance video.  The court explained:

> The officers made several requests for the video and everyone involved appears to have been operating on the assumption that it would not be erased for 90 days.  That the store owner was wrong, and that the video was automatically overwritten while still in the store owner's custody, does not suggest a purposeful effort by the police to keep exculpatory evidence from the hands of the defense. To the contrary, the police clearly wanted the store to preserve the tape because the assault it depicted supplied a motive for murder.

People v. Keller, 2010 WL 3159027, at *6.  Perhaps the police were negligent in relying on the store owner's assurances that the tape would be preserved for 90 days, but this is not sufficient to show bad faith and establish a violation of due process in this case.  See Grisby v. Blodgett, 130 F.3d 365, 371 (9th Cir. 1997) (negligent failure to preserve potentially useful evidence is not enough to establish bad faith and does not constitute a violation of due process).

/

/

12

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED:   Nov. 4, 2011

_____
CHARLES R. BREYER
United States District Judge

G:\CRBALL\2011\1190\Keller, L1.merits.wpd